IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CAROL KLINE,<br><br>                      Plaintiff,<br><br>vs.<br><br>THE UTAH ANTIDISCRIMINATION AND LABOR DIVISION,<br><br>                      Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:08-CV-107-TC |

        Carol Kline alleges that her former employer, the Utah Antidiscrimination and Labor Division, retaliated against her for making discrimination complaints and discriminated against her based on her sex, all in violation of Title VII of the Civil Rights Act of 1964 and in breach of the June 30, 2003, conciliation agreement settling Ms. Kline's earlier claim of discrimination. The UALD filed a motion for summary judgment, claiming that Ms. Kline was "a victim of her own, and well documented, poor work performance," and that the undisputed facts do not support her Title VII and breach of contract claims.

        Because there is not enough evidence in the record for a rational trier of fact to find that Ms. Kline was targeted because she is a woman or because she had lodged discrimination complaints, and for the reasons set forth more fully below, the UALD's motion for summary judgment is granted. The UALD's motion to strike certain exhibits attached to Ms. Kline's opposition to the UALD's motion for summary judgment is denied as moot.

**BACKGROUND**

Ms. Kline worked as an anti-discrimination investigator at the UALD from May 11, 1998, until she resigned on August 11, 2005. As an investigator, Ms. Kline was responsible for preparing written determinations that reflected her legal and factual analysis of the UALD cases assigned to her.

**Original EEOC Complaint**

On November 19, 2002, Ms. Kline and three other investigators–Ana Piña-Del Valle, Candice Warren, and Stephanie Carrillo–filed a discrimination complaint with the EEOC. The UALD Director who was the subject of much of the November 19, 2002, complaint, Joseph Gallegos, resigned.

On April 15, 2003, Harold Stephens, who would become Ms. Kline's supervisor on August 7, 2003, coauthored an editorial in which he wrote that "[f]ifteen of the division's 19 employees know allegations [that Mr. Gallegos] has discriminated against his staff are groundless." (Mem. in Opp. to Mot. For Summ. J., Ex. 32.) Ms. Kline alleges that Mr. Stephens and Mr. Gallegos were "very close," and that Mr. Stephens posted the editorial he had written in the copy room.[1]

**Conciliation Agreement**

On June 30, 2003, the four investigators resolved their complaint with the UALD by entering into a conciliation agreement. The conciliation agreement contained a no retaliation provision, which reads: "[The UALD] agrees that there shall be no discrimination or retaliation

---

[1] Ms. Kline also alleges that Mr. Stephens and another employee, Bel Randall, told others at the UALD to ostracize Ms. Kline, but she has provided no admissible evidence to that effect. (See Mem. in Supp. of Mot. For Summ. J., Ex. 31, (Kline Dep.) at 47:5-12 ("Q: And you have evidence that Mr. Randall instructed coworkers of you to ostracize and exclude you? A: No, sir. I don't. Q: Do you have any evidence that Mr. Stephens instructed coworkers of you to ostracize and exclude you? A: Secondhand from Joan Carter."))

of any kind against [Ms. Kline] as a result of filing this charge or against any person because of opposition to any practice deemed illegal under the UADA, EPA, ADA, the ADEA or Title VII, as a result of filing this charge, or for giving testimony, assistance or participating in any manner in an investigation, proceeding or a hearing under the aforementioned Acts." (Complaint, Ex. B, ¶ 4.)

**Ms. Kline's Treatment**

Ms. Kline alleges that Mr. Stephens returned Ms. Kline's written work with "harsh and caustic comments;" that he gave her inconsistent direction; that he yelled at and criticized her in front of other employees; that he called her stupid and incompetent; that she was seen leaving his office in tears; that she was not allowed to go to certain fair-housing training that other female investigators were allowed to go to; and that she was not provided the legal-writing training she needed.

Around this time, there were four female investigators: Ms. Kline, Cathy Biljanic, Stephanie Carrillo, and Joan Carter. There was one male full-time investigator, Thomas Hauser, and one male part-time investigator, Dennis Crenshaw. Although it is undisputed that every other investigator complained about Mr. Stephens' conduct, Ms. Kline claims that she was treated worse than the other employees, and that Mr. Stephens did not yell at anyone else the way that he yelled at her. According to Ms. Kline's witness, Mr. Hauser, after Ms. Kline left the UALD Mr. Stephens began singling out another employee, Ms. Carter, to treat the way he had treated Ms. Kline.

Additionally, Ms. Kline alleges that Mr. Stephens "by his own admission . . . has a strange sense of humor," and that he made inappropriate remarks that included sexual innuendos, which was "was pretty much his way of doing things." (Mem. in Supp. to Mot. For Summ. J.,

3

Ex. 31, (Kline Dep.) at 55:6-56:20.)

Ms. Kline gave the following examples at her deposition: After Ms. Kline thanked Mr. Stephens for letting her look through the case files on his desk, Mr. Stephens said, "you can fondle my files any time;" another time Ms. Kline asked "so what does someone have to do to work in [the] wage and hour [department]?", and Mr. Stephens responded, "why don't you come over and sit on my lap and see what comes up?;" at an out-of-town training, Mr. Stephens asked if anyone wanted to come up to his room to have some cookies or candy, and then laughed; and Ms. Kline overheard a conversation between Mr. Stephens and another employee during which Mr. Stephens was talking about golfing and then one of the two made a double entendre with the word "balls." Ms. Kline complained to Sherrie Hayashi, the Division Director for the UALD, about these comments, and heard no additional comments after her complaint. Ms. Kline says that Mr. Stephens sent inappropriate email forwards, but she had told Mr. Stephens "early on" that she did not want to receive that sort of email, so he did not send them to her.

**Corrective Action Plans**

In December 2003 Mr. Stephens was going to put Ms. Kline on a Corrective Action Plan to improve alleged deficiencies in her performance. Ms. Kline went to Ms. Hayashi to discuss what she perceived as Mr. Stephens' harassment of her, and then she "fell apart and was out [of the office] for three weeks." (Mem. in Supp. to Mot. For Summ. J., Ex. 31, (Kline Dep.) at 77:15-17.)

On January 30, 2004, Ms. Kline was placed on a CAP though April 12, 2004.[2] On September 16, 2004, Ms. Kline was placed on another CAP, which was to last until March 14, 2005, but which was extended to May 15, 2005.

---

[2] The record is unclear regarding whether the January 30, 2004 CAP was extended beyond April 12, 2004.

On March 31, 2005, Ms. Kline complained to Mr. Stephens and then others at the UALD that she was being retaliated against for her earlier discrimination complaint and that Mr. Stephens was sexually harassing her. These complaints were documented by Ms. Kline in emails and on her CAP forms, and in UALD memoranda written by Mr. Stephens and Ms. Hayashi.

**Notice of Intent to Terminate**

On July 11, 2005, Ms. Kline was given a notice of intent to terminate. Instead of opposing the notice within the UALD or waiting for her employment to be officially terminated, Ms. Kline resigned on August 11, 2005. For the purpose of deciding the motion for summary judgment, the court accepts that Ms. Kline was effectively fired by the UALD.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(c). In deciding a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**RETALIATION CLAIM**

Title VII contains an anti-retaliation provision that prohibits an employer from discriminating against an employee because that employee "has opposed any practice made an unlawful employment practice" by Title VII or because the employee has participated in an investigation, proceeding or hearing under Title VII. 42 U.S.C. § 2000e-3(a); see Pinkerton v. Colo. Dept. of Transp., 563 F.3d 1052, 1064 (10th Cir. 2009). Because Ms. Kline seeks to prove

her Title VII retaliation claim through indirect or circumstantial evidence, the court applies the three-part burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[3] Id.

"To establish a prima facie case of retaliation, a plaintiff must demonstrate (1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." Id. (quoting Argo v. Blue Cross and Blue Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir. 2006)).

A reasonable employee would have found the challenged action materially adverse if the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quotations omitted). (This is a different and less stringent standard than the one applied to charges of sexual discrimination based on tangible employment actions, as discussed below.)

And the challenged action must have occurred within 300 days before Ms. Kline's Title VII complaint, April 17, 2006. See 42 U.S.C. § 2000e-5(e)(1); Duncan v. Manager, Dep't of Safety, City and County of Denver, 397 F.3d 1300, 1308 (10th Cir. 2005).

**Challenged Actions**

In her opposition memorandum, Ms. Kline alleges that she was retaliated against when she was subjected to the following adverse acts: "Plaintiff was placed on a Corrective Action Plan. Plaintiff was subjected to unprofessional and excessive tirades from her supervisor.

---

[3] Ms. Kline claims that she has direct evidence of retaliation. According to Mr. Hauser, Mr. Stephens told Mr. Hauser that Mr. Stephens was placing Mr. Hauser on a CAP to avoid appearing as though he was targeting Ms. Kline. Ms. Kline equates "targeting" with "targeting for a discriminatory reason." But there is no evidence that Mr. Stephens meant anything other than that he did not want it to seem like Ms. Kline was being singled out for her poor performance.

Plaintiff had work rejected, even after other investigators reviewed the material and agreed that it was fine. Plaintiff was denigrated by her supervisor for using a[n] analysis that her previous supervisor had instructed her to use in the performance of her job. When the Plaintiff complained about the harassing behavior and pointed out that she was following the analysis previously provided by the Defendant, the Defendant moved to terminate her." (Mem. in Opp. to Mot. For Summ. J., at 37.)

If Ms. Kline establishes a prima facie case of retaliation, the burden of production shifts to the UALD to articulate a legitimate, nondiscriminatory reason for the adverse employment action. See Pinkerton, 563 F.3d at 1064. If the UALD meets this burden, then summary judgment is warranted unless Ms. Kline can show that there is a genuine issue of material fact as to whether the reasons for the adverse employment action proffered by the UALD are pretextual. See id.

The court assumes for the purpose of deciding this summary judgment motion that Ms. Kline has established a prima facie case that she was retaliated against.

**Nondiscriminatory Explanation**

The burden then shifts to the UALD, which has asserted that Ms. Kline was put on the CAPs and ultimately discharged because of poor performance. The deficiencies in Ms. Kline's written work product were well-documented by the UALD in memoranda to Ms. Kline's file by many of her supervisors during her tenure at the UALD and in the CAPs themselves.

According to Ms. Hayashi, "[i]n January 2004, [Ms. Hayashi] was asked by Ms. Kline to review one of [Ms. Kline's] determinations, and the work product that [Ms. Hyashi] reviewed contained substantial factual errors, errors in the analysis and a work product, when read, that

made no sense." (Mem. in Supp. of Mot. For Summ. J., Ex. 30, ¶ 14.) Ms. Hayashi "made the decision to issue the Notice of Intent toDismiss [sic] based upon [her] personal observation of Ms. Kline's inability to apply proper *prima facie* elements to her cases, her failure to follow directions on investigative followup work, her inability to stay focused on relevant facts, misstating facts, and an inability to provide a clear written and well analyzed work product." (Id. ¶ 21.) According to Ms. Hayashi, "[n]o other investigators, male or female, experienced the degree of difficulty in meeting performance expectations as has Ms. Kline. No other investigator required the degree of time by the Case Manager and Director to review, correct, re-review, revise, re-review again, and correct Ms. Kline's work product." (Id. ¶ 26.)

A memorandum to the file from Mr. Stephens, dated August 18, 2004, specifically describes the problems with Ms. Kline's analysis and Mr. Stephen's plan to initiate a CAP. He writes, "[t]he CAP will include a third party, of [Ms. Kline's] choosing, to review her submitted work, attendance at a technical writing class, to help [Ms. Kline] with her analytical ability." (Mem. in Supp. of Mot. For Summ. J., Ex. 19, at 2.) A January 26, 2004, amendment to Ms. Kline's CAP explains that "[b]ased on our inability to identify a commercially available [legal writing] course . . . . [Mr. Stephens] will be conducting a ½ day seminar [and] Lauren Scholnick [will] present a 2 hour legal writing course . . . . Additionally, [Mr. Stephens] asked the Director's approval to send [Ms. Kline] to Washington D.C. for the initial Fair Housing Training module in the Investigator Certification Program[, which] includes a module that covers critical analysis and effective writing." (Mem. in Supp. of Mot. For Summ. J., Ex. 21, at 1.)

In an email to Mr. Stephens on November 17, 2004, UALD employee Ashlee Jolley, who had been reviewing Ms. Kline's work at Ms. Kline's request, wrote that "[y]esterday [Ms. Kline] submitted a case for my review that was not very coherent or organized." (Mem. in Supp. of

8

Mot. For Summ. J., Ex. 30, at 65.) She also wrote that despite seeing "some definite improvement in some respects," Ms. Kline continued to make "the same mistakes in that she has a hard time analyzing the different [bases for claims of discrimination]." Id.

**Evidence of Pretext**

"Under McDonnell Douglas, our role isn't to ask whether the employer's decision was wise, fair or correct, but whether it honestly believed the legitimate, nondiscriminatory reasons it gave for its conduct and acted in good faith on those beliefs." Johnson v. Weld County, Colo., 594 F.3d 1202, 1211 (10th Cir. 2010) (quotations omitted).

Ms. Kline does not deny that Ms. Hayashi believed the reasons given by the UALD for Ms. Kline's termination. (See Mem. in Supp. of Mot. For Summ. J., Ex. 31, (Kline Dep.) at 79:21-80:11 ("Q: And you state in your Complaint that you believe that the performance – claimed performance issues that Mr. Stephens and Ms. Hayashi point to were a pretext for sort of the hiding of their true reasons for letting you go. What do you believe the true reasons were? A: Honestly, I believe that Ms. Hayashi was so new in the position she depended on Mr. Stephens a great deal, and I believe that she allowed him to do the things he did. And I also believe she thought that I was all the things he said, which were not true. And I have proved to myself since with the employers I've had and with the discovery I found that Mr. Stephens cannot analyze or write. And he's no longer – he's been demoted a couple of times or changed positions because he can't do his job."))

Ms. Kline also presents no evidence that Ms. Jolley's criticisms, which echo those of Ms. Hayashi and Mr. Stephens, were pretextual.

According to Ms. Kline, Mr. Stephens, on the other hand, was incompetent, gave

9

inconsistent feedback, was not clear, and generally lacked the skills to evaluate the investigators'

work. Ms. Kline provided a printout of her employee evaluations from May 11, 1998, to June

30, 2004, showing seven "successful" "agency ratings" and one "highly successful" "agency

rating." (Mem. in Opp. to Mot. For Summ. J., Ex. 1.) These ratings standing alone mean little,

given that Mr. Stephens himself appears to have rated Ms. Kline "successful" for the same time

period during which he placed her on a CAP. Even if Ms. Hayashi, Mr. Stephens, and Ms. Jolley

were all wrong about the quality of Ms. Kline's work, Ms. Kline has not provided sufficient

evidence to support a finding of pretext.

Ms. Kline's strongest evidence that Mr. Stephens harbored ill will toward her for filing

the original discrimination complaint is that Mr. Stephens coauthored an editorial alleging that

Ms. Kline's first discrimination claim was unfounded and then posted it in the copy room. But

the record does not support Ms. Kline's claim that Mr. Stephens acted on his ill will–that he

retaliated against her–when he evaluated her work. In fact, Mr. Stephens first tried to put Ms.

Kline on a CAP in December 2003–four months after he became her supervisor and five months

after Ms. Kline settled her first discrimination claim with the UALD. That he waited four

months to place Ms. Kline on a CAP does not support the conclusion that Mr. Stephens was

seeking revenge. Ms. Kline was not given the notice of intent to terminate until two years after

she settled her original complaint, a year and a half after she complained to Ms. Hayashi about

Mr. Stephens' harassment, and three months after she complained to Mr. Stephens.

Besides the allegations related to her performance, Ms. Kline has alleged that the UALD

retaliated against Ms. Kline through Mr. Stephens' constant criticisms and mistreatment.[4] But,

according to Ms. Kline, Mr. Stephens treated her worse than he treated Ms. Carrillo, another

---

[4] Snubbing and silent treatment do not rise to the level of actionable retaliation. Johnson, 594 F.3d at 1216.

original complainant, and eventually turned his attention toward Ms. Carter. Ms. Kline has not provided evidence that Mr. Stephens' treatment of Ms. Kline was not the result of some combination of erratic, unprofessional behavior directed toward everyone and erratic, unprofessional behavior directed at Ms. Kline because of Mr. Stephens' assessment (correct or incorrect) of her work product.

In sum, Ms. Kline has not provided evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the UALD's] proffered legitimate reasons for [its allegedly retaliatory behavior] that a reasonable factfinder could rationally find them unworthy of credence and hence infer that [the UALD] did not act for the asserted non-discriminatory reasons." Pinkerton, 563 F.3d at 1064 (quotations omitted).[5]

Ms. Kline's bare assertions that "[t]he Plaintiff was also clearly performing her duties," "the issue of pretext is clearly established by the evidence," and "Plaintiff has clearly established the necessary elements for a retaliation claim based on the Defendant's use of the Corrective Action Plan and the Defendant's termination of the Plaintiff" are not sufficient and are not supported by the record.

**SEXUAL DISCRIMINATION CLAIM**

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). Ms. Kline alleges that she was discriminated against

---

[5] Having determined that the record could not support a finding that the UALD's conduct as a whole was retaliatory, or that any of the actions Ms. Kline specifically complains of was retaliatory, the court does not parse each individual act to determine which complaints are time barred.

because of her sex in violation of Title VII when the UALD took tangible employment actions against her and because of the hostile work environment created by the UALD.

### **Tangible Employment Action**

The court applies the same McDonnell Douglas three-part burden-shifting analysis to Ms. Kline's sexual discrimination claim based on tangible employment actions taken against her, except that the challenged actions must "affect employment or alter the conditions of the workplace." Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 62 (2006).

In the 300 days before Ms Kline's discrimination charge, the UALD issued its notice of intent to dismiss (on July 11, 2005), and Ms. Kline resigned on August 11, 2005. It appears Ms. Kline was no longer on a CAP, but in any event being subject to a CAP is not an adverse employment action. See Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1225 (10th Cir. 2006) (recognizing that placement on a performance improvement plan did not constitute an adverse employment action where the PIP had no immediate effect on employment status and did not come with a change in pay or responsibilities). Therefore, the court considers the CAPs only as background evidence in support of Ms. Kline's discrimination claim relating to her termination. See id. at 1223 (noting that employees are not barred from using prior acts as background evidence in support of timely claims).

Because Ms. Kline does not provide enough evidence for a rational trier of fact to find that the UALD's reason for terminating Ms. Kline was pretextual (see above), Ms. Kline's sexual discrimination claim for constructive discharge fails. In fact, Ms. Kline has provided no evidence that she was terminated because she is a woman (or even that she was placed on the CAPs that led to her termination because she is a woman). Mr. Stephens' remarks are not

enough for a rational trier of fact to find that gender bias motivated the termination of Ms. Kline's employment.

**Hostile Work Environment**

To recover for a Title VII claim of sex discrimination based on a hostile work environment, "a plaintiff must show (1) that she was discriminated against because of her sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." Pinkerton, 563 F.3d at 1058 (quoting Medina v. Income Support Div., 413 F.3d 1131, 1134 (10th Cir. 2005)).

Ms. Kline and her coworker, Mr. Hauser, claim that Mr. Stephens berated Ms. Kline in public and private, calling her stupid and criticizing the quality of her work. Mr. Hauser also says that after Ms. Kline left the UALD, Mr. Stephens set his sites on a new target, also a woman, for similar abuse. Although the Utah Antidiscrimination Division argues that only events occurring within the 300-day pre-filing statutory period can be considered in Ms. Kline's hostile work environment claim, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002).

Ms. Kline has provided sufficient evidence for a trier of fact to find that the working environment Mr. Stephens created was abusive, but she has provided no evidence that Ms. Kline was discriminated against because of her sex (or, in other words, that Mr. Stephens would have treated her differently had she been a man).

Ms. Kline does not allege that Mr. Stephens' inappropriate sexual remarks were

13

disproportionately directed toward her. In fact, at her deposition, Ms. Kline could only think of two sexual remarks—two jokes undoubtedly in poor taste—that were directed at Ms. Kline. And Ms. Kline stated that after she complained to Mr. Stephens and Ms. Hayashi about Mr. Stephens' inappropriate sense of humor, the jokes stopped. Similarly, Mr. Stephens did not send any inappropriate email forwards to Ms. Kline after she told him that she did not wish to receive them. Mr. Stephens' alleged conduct, although boorish, was not sufficiently severe or pervasive to constitute a hostile work environment. See Sprague v. Thorn Ams., Inc., 129 F.3d 1355, 1366 (10th Cir. 1997) (affirming dismissal of the plaintiff's claims on summary judgment where her supervisor's conduct, although "unpleasant and boorish," did not create a hostile work environment actionable under Title VII).

## BREACH OF CONTRACT CLAIM

No rational trier of fact could find that, following the settlement of Ms. Kline's original complaint, the UALD retaliated against or discriminated against Ms. Kline because she is a woman or because of her discrimination complaints. Therefore, no rational trier of fact could find that the Utah Antidiscrimination Division breached its agreement not to retaliate against Ms. Kline, and Ms. Kline's breach of contract claim fails.

**ORDER**

For the foregoing reasons, the UALD's motion for summary judgment is granted and the UALD's motion to strike is denied as moot.

SO ORDERED this 31st day of March, 2010.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge